### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br><br>**v.**<br><br>**JASON CAIN** | **Criminal Action**<br><br>**No. 24-cr-293** |

**GOLDBERG, J.**                                              **August 13, 2025**

### <u>MEMORANDUM OPINION</u>

This case presents difficult Fourth Amendment questions, including whether probable cause exists to search for child pornography on the electronic devices of persons with a sexual interest in children. I also consider whether the good faith exception protects officers who assume such a connection.

Defendant Jason Cain was charged by federal indictment with manufacture and attempted manufacture of child pornography as well as possession of child pornography. These charges stem from a Pennsylvania State Police investigation in which a number of child victims alleged Defendant either exposed his genitals or sexually assaulted the children inside his home. The evidence in question consists primarily of photographs and videos seized during a series of searches conducted by state and federal officers.

Defendant has moved to suppress the first two search warrants, the evidence obtained from those searches, and other later approved search warrants which relied on the same or similar facts set forth in the initial warrants.

1

After a careful examination of the warrants in question and applicable Third Circuit precedent, I am compelled to find that the first two warrants lacked probable cause and that the good faith exception does not apply. I must also conclude that the later warrants and evidence collected therefrom are fruit of those deficient warrants. Consequently, I will grant Defendant's Motion and suppress all evidence derived from the search warrants in question. The bases for reaching these conclusions follow.

## I.    BACKGROUND

Because my review of Defendant's Motion to Suppress is confined to the four corners of the search warrant and attendant probable cause affidavits, I refer only to averments taken from those documents. See United States v. Zimmerman, 277 F.3d 426, 430 n.3 (3d Cir. 2002).

### A.    The First Search Warrant (October 20, 2023)

On October 16, 2023, the parents of Victims 1 and 2 reported to Pennsylvania State Police that Defendant "had been exposing his genitals to their daughters." (ECF No. 26 Ex. A at 3 of 15.) At that time, Victim 1 was six years old and Victim 2 was nine years old. (Id.) These incidents occurred at Defendant's residence while Defendant "was entrusted with watching [the Victims as] they play[ed] with his son." (Id.) Later that day, police conducted interviews of both Victims 1 and 2.[1]

Victim 1 recalled three instances where Defendant exposed himself while she was playing at his home. First, when she was five years old, she recalled playing "hide and go seek with [Defendant's son in his home]." (Id.) Defendant told Victim 1 to "hide under the desk he was

---

[1] Victims 1 and 2 informed police that Defendant exposed himself on five separate occasions while they were at his home for a play date. The Victims provided a date for only one of those incidents. The other incidents occurred at some unspecified date.

sitting at," and when she did so, she "saw his 'privates' outside of the jeans he was wearing." (Id.) A second time, when Victim 1 was still five, she "observed [Defendant] in [his] bathroom with the door open, wearing a shirt and no pants." (Id.) When Defendant heard his wife pull into the driveway, "he quickly shut the door." (Id.) Victim 1 described a third incident occurring on October 15, 2023, the day before her interview with police. There, Victim 1 went upstairs with Defendant's son to ask Defendant to tie her shoe. She "observed him naked in the bathtub," and Defendant told his son "to go get him his wallet" and "asked Victim 1 to get him a towel." (Id.) Victim 1 complied and then went outside to play. While outside, she rolled her ankle and came inside to ask Defendant for ice. "Defendant was downstairs wearing nothing but a bath towel around his waist" and when he went to put ice on Victim 1's ankle, "he lifted his towel and she saw his 'privates.'" (Id.) Victim 1 explained that, that day, "his 'privates' looked different from the other times she had seen them," because his penis "was straight rather than hanging down." (Id.) Victim 1 also told police that "whenever [Defendant] hears his wife come home or make a noise in the house[,] he quickly runs away to get dressed." (Id. at 4 of 15.)

Victim 2 described two incidents where Defendant exposed his genitals. First, on an unspecified date, Victim 2 saw Defendant in his bedroom "wearing only a towel around his waist." (Id.) Defendant told Victim 2 to retrieve a bag of candy from him, and after she did so, he asked for a piece. When he went to get the candy, "he dropped the towel from his waist to the floor" and "did not try to catch the towel from falling or immediately reach down to pick it up or to try to cover himself up in any way." (Id.) Instead, Defendant "stood there naked and looked at her." (Id.) Second, on an unspecified date, Defendant was "wearing only his underwear which had buttons on the front." (Id.) Victim 2 could see his genitals through an opening in his underwear.

Victims 1 and 2 explained that each incident occurred at Defendant's home and that on an unspecified date, Defendant used a "Go-Pro" camera to videotape the children playing in his home. In addition, the mother of Victims 1 and 2 explained that she "often receive[d] photographs of her children from [Defendant] via text message while they are at his residence." (Id.) There is no indication that these photographs were pornographic or sexual in nature.

The first probable cause affidavit consists of these facts and Trooper Amanda Price's opinions. Price averred that "persons with a sexual interest in children may use electronic devices to store images and/or videos of children for the purpose of sexual gratification." (Id.) She also provided a series of opinions, based on her "training and experience"[2] regarding the use of digital mediums including cameras, cell phones, and digital storage devices. She explained that she "believe[d] that there may be photographs and/or videos of Victim 1 and Victim 2" on those devices. (Id. at 5 of 15.)

On October 20, 2023, a state magistrate judge granted the first search warrant application. The search warrant identified the following items to be searched for and seized: (1) "Any mobile devices, computers, tablet devices, cell phones or other electronic devices capable of facilitating creation, storage, editing, and printing of images and other types of data files or sending and receiving messages over internet connection"; and (2) "Any electronic storage devices to include external hard disk drives, USB flash drives, and other storage media capable of storing computer data files." (Id. at 2 of 15.) It described Defendant's crimes as "Indecent Assault,[3] Unlawful Contact with Minor, [and] Endangering the Welfare of a Child." (Id.)

---

[2] To be clear, the affidavit does not specifically explain any trainings or experience Trooper Price had which would allow her to provide opinions on the molestation-pornography nexus or how child predators use digital devices to retain child pornography.
[3] Both Parties agree this was a mistake and that the crime should have been labeled as "indecent exposure."

That same day, October 20, 2023, Trooper Price applied for and received an arrest warrant for Defendant.  The crimes enumerated in the arrest warrant and pursuant to the Pennsylvania Criminal Code were: (1) indecent exposure; (2) unlawful contact with a minor – sexual offenses; (3) endangering the welfare of children; and (4) corruption of minors.  (ECF No. 26 Ex. E at 3-4 of 7.)

Again, on the same day, October 20, 2023, police arrived at Defendant's residence to serve both the arrest warrant and the first search warrant.  Although officers knocked on Defendant's door and announced their presence, Defendant "took several minutes to open the front door." (ECF No. 26 Ex. B at 7 of 8.)  When Defendant finally opened the door, he "appeared to have an erection visible from the outside of his pajama pants."  (Id.)  Trooper Price explained that she was there to arrest him for the crime of indecent exposure.  (Id.)  Defendant did not deny the charge, but instead responded "by asking who he had exposed himself to."  (Id.)

When police entered the home, they saw a home office "located just inside the front door to the left."  (Id.)  Police observed a computer on the desk which was "unlocked and [had] a notification on the top right corner of the screen indicat[ing] that an external device had been improperly ejected."  (Id.)  In front of the desk, Police saw an "unknown fluid . . . on the seat of the computer chair," and next to the chair, police observed a "bottle of Gold Bond lotion and a roll of toilet paper."  (Id.)  Propped up against the computer was Defendant's iPhone, which was unlocked and concurrently tracking the location of Defendant's wife.  (Id.)  Police collected some 20 digital devices including cameras, laptops, hard drives, and cell phones.

### B.    The Second Search Warrant (October 23, 2023)

On October 23, 2023, Trooper Price applied for a second search warrant so that she could forensically download the contents of the items seized during the execution of the first search warrant. The second search warrant is nearly identical to the first but also includes facts observed on October 20, 2023 during the execution of Defendant's arrest warrant. (See ECF No. 26 Ex. B at 7 of 8.) Trooper Price included a new opinion, that she "believe[d] that there may be photographs and/or videos of . . . *other minors whose identities are not yet known to police as well as sexually explicit images of children*." (Id. at 8 of 8 (emphasis added).) The warrant noted that officers now sought to download the data obtained from the first warrant to find evidence of a new crime: "Sexual Abuse of Children."[4] (Id. at 3 of 8.)

The second search warrant application was granted on October 23, 2023 by the same magistrate who approved the first search warrant. The contents of the seized items are discussed in the third search warrant application.

### C.    The Third Search Warrant (December 21, 2023)

On December 21, 2023, Pennsylvania State Police applied for and received a third search warrant. (ECF No. 26 Ex. C.) The probable cause affidavit contained much of the same information as the first two search warrants but also included statements from two new victims and descriptions of the evidence obtained from the search and seizure of Defendant's digital devices. I address only the new information contained in the third probable cause affidavit.

First, the mother of Victim 3 told officers that Defendant exposed his genitals to her son, a seven-year-old boy. (Id. at 3 of 8.) Victim 3 was interviewed and explained that on an undisclosed

---

[4] Pennsylvania's child pornography statute. 18 Pa. C.S. § 6312.

date, Defendant "asked Victim 3 to come into the bathroom when [Defendant] was naked and in the bathtub and asked Victim 3 to get him a piece of chocolate." (Id.) When Victim 3 complied, Defendant "got out of the bathtub and asked Victim 3 to get him a towel," at which point, Victim 3 observed Defendant's penis. (Id.)

The mother of Victim 4 told Pennsylvania State Police that her seven-year-old son "disclosed that [Defendant] had engaged in indecent contact with him inside [Defendant's] residence." (Id.) Victim 4 was interviewed and told police that on "multiple occasions," he "went to the creek with the defendant and defendant's son," and that afterwards, Defendant made "Victim 4 take off all his clothes" to check for ticks. (Id.) Defendant was also naked during these "tick checks." (Id.) Defendant then "touched the entire naked body of Victim 4, including his genitals, and had Victim 4 check the defendant's body and touch his genitals." (Id.) These "tick checks" occurred on multiple occasions inside Defendant's bedroom. Victim 4 also reported that he observed Defendant "naked in his bathtub on more than two occasions." (Id.)

In addition to these statements, Trooper Price included a description of the evidence downloaded from Defendant's devices. One video "depicts both the defendant and Victim 4 fully naked and the defendant repeatedly encouraging Victim 4 to touch his naked body, specifically his genital area." (Id. at 4 of 8.) Another shows Defendant "taking close up videos of the body and genitals of Victim 4." (Id.)

Price also included facts about a fifth victim. As she explains it, the videos "depict Victim 5 in various locations inside the residence, including in the bathtub and on the defendant's bed." (Id.) The images "included clothed videos of Victim 5 focused on her genital area." (Id.) Other videos show "defendant naked and shaking his genitals behind Victim 5 in a bathroom, Victim 5

naked in the defendant's bedroom, and the defendant removing his clothing and exposing himself to Victim 5 while she looks for something in his bedroom."  (Id.)

Based on these factual averments as well as the information included in the first two search warrants, the magistrate approved an additional search of Defendant's home to locate other digital devices.

### D.     The Fourth Search Warrant (July 9, 2024)

On May 20, 2024, Defendant's wife "informed investigators she had located several items while cleaning out and packing the basement of [Defendant's residence] in preparation to sell the [home]."  (ECF No. 27 at 28 of 39.)  Defendant's wife "met with investigators and turned over" three SD cards, a spy pen, a power bank for the spy pen, and various camera accessories.  (Id. at 28-29 of 30.)

On July 22, 2024, FBI Special Agent Jason Huff applied for and received a federal search warrant for the newly discovered devices.  (Id.)  The accompanying affidavit contains a description of SA Huff's experience in many facets of law enforcement, including online sexual exploitation of children and the use of computers and related devices in the child pornography context.

This search warrant repeats many of the same factual averments contained in the previous three search warrants.  It also contains an in-depth description of the videos found as a result of the first three search warrants.  (Id. at 24-27 of 39.)  This includes an explicit description of Defendant's surreptitious recording of some six victims.  The videos show the minors' genitals and capture Defendant masturbating in front of multiple victims.

Based on these averments, a federal magistrate judge approved the fourth search warrant, allowing the FBI to search the evidence disclosed by Defendant's wife.

## II.    LEGAL STANDARDS

"In determining whether probable cause exists to support the issuance of a search warrant, courts consider the totality of the circumstances." United States v. Deshields, No. 19-99, 2021 WL 1401790, at *3 (M.D. Pa. Apr. 14, 2021) (citing Illinois v. Gates, 462 U.S. 213, 238-39 (1983)).  A magistrate "must make a practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Stearn, 597 F.3d 540, 554 (3d Cir. 2010) (internal quotations and citations omitted).

In reviewing a magistrate's decision to issue a search warrant, courts "exercise only a deferential review of the initial probable cause determination." United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993).  Courts do not, however, "rubber stamp a magistrate's conclusions." United States v. Tehfe, 722 F.2d 1114, 1117 (3d Cir. 1983).  Instead, in reviewing a magistrate's decision, courts ask whether the magistrate "had a substantial basis for concluding that probable cause existed." Conley, 4 F.3d at 1205 n.2 (internal citations omitted) (cleaned up).  Courts must "uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found." Id. at 1205.  In making this determination, the "reviewing court should only assess the facts within the four corners of the probable cause affidavit." United States v. Gillard, No. 23-26, 2024 WL 263929, at *6 (E.D. Pa. Jan. 24, 2024) (citing United States v. Beatty, 437 F. App'x 185, 187 (3d Cir. 2011)).

Even if a warrant is devoid of probable cause, such a violation "does not always guarantee suppression of evidence derived from an illegal search." United States v. Caesar, 2 F.4th 160, 167 (3d Cir. 2021).  "That is because 'the exclusionary rule is not an individual right,' but a prudential remedy meant to deter law enforcement officials from engaging in unreasonable searches and seizures." Id. (quoting Herring v. United States, 555 U.S. 135, 141 (2009)).  Put another way,

"[t]he [exclusionary] rule is calculated to prevent, not to repair." Elkins v. United States, 364 U.S. 206, 217 (1960).

Suppression is a last resort because courts understand that this sanction "carries significant costs." Caesar, 2 F.4th at 167. With this in mind, the Supreme Court established the "good faith exception" to the exclusionary rule, prohibiting suppression of "'evidence obtained in objectively reasonable reliance' on a warrant later invalidated for lack of probable cause." Id. (quoting United States v. Leon, 468 U.S. 897, 922 (1984)).

## III. DISCUSSION

Defendant primarily challenges the first two warrants, arguing that they are: (1) unconstitutional general warrants; (2) lack probable cause; and (3) so lack any indicia of probable cause as to render official belief in the existence of probable cause entirely unreasonable. Because I find that suppression is warranted under Defendant's second and third arguments, I need not address whether the warrants were unconstitutional general warrants.

I begin by noting that the warrants in question clearly set forth evidence of criminal conduct. The critical question is whether the warrants provide a substantial basis for concluding that probable cause exists to search for child pornography on Defendant's computers and related electronic devices.[5]

---

[5] The Government urges that the purpose of the first search warrant was to "corroborate [Victim 1 and 2's] account (and their mother's testimony) that the children were at the defendant's home at the same time that the defendant was also in the home." (ECF No. 26 at 24.) A more accurate reading of the first and subsequent search warrants indicate that police were searching for child pornography. See Zimmerman, 277 F.3d at 432 (rejecting the Government's attempt to "recast history" to claim police were merely "looking for evidence of 'wrongdoing,'" and explaining that the warrant really sought "child pornography"). I make this finding for several reasons. First, taken together, the affidavit clearly states that police were hoping to find images of Victims 1 and 2 kept by Defendant for sexual gratification—child pornography. See Conley, 4 F.3d at 1206 (explaining that the Court must read the facts within the affidavit "in [their] entirety and in a common sense and nontechnical manner."). Second, Trooper Price's opinion connecting those with a sexual interest in children to the use of electronic devices is only necessary if police are

### A.  Third Circuit Precedent – The <u>John</u>, <u>Zimmerman</u>, and <u>Caesar</u> Decisions

Both Parties agree that three precedential decisions from the United States Court of Appeals for the Third Circuit are instructive.

First, in <u>United States v. Zimmerman</u>, the Third Circuit reversed the District Court's denial of the defendant's motion to suppress.  277 F.3d at 426.  Zimmerman was a schoolteacher who sexually abused several students.  <u>Id.</u> at 430.  During a police investigation, officers interviewed a former student, who explained that Zimmerman "had shown him 'Internet pornography' at Zimmerman's home when [the student] was a senior in high school."  <u>Id.</u>  The pornography at issue "depicted a woman performing oral sex on a horse."  <u>Id.</u>  Police applied for a search warrant, providing an affidavit of probable cause in which officers described: (1) Zimmerman "allegedly sexually accost[ing] students at the high school or on athletic road trips"; (2) the video clip (depicting bestiality) shown to the former student at Zimmerman's home; (3) a mother's statement that the same video had been shown to other victims; and (4) an opinion by "Postal Inspector Thomas Clinton stating, among other things, that persons with a sexual interest in children may possess child pornography and keep it in their homes for extended periods of time."  <u>Id.</u> at 431.

The warrant sought authorization to search for evidence of "18 Pa. Cons.Stat. §§ 2701 (simple assault), 2709 (harassment and stalking), 6301 (corruption of minors) and 6312 (sexual abuse of children, which includes the possession of child pornography)."  <u>Id.</u>  The warrant identified, as items to be searched for and seized, electronic devices and "any sexual materials including photos, printed materials or likenesses such as images of humans in sexual contact with

---

searching for child pornography.  <u>See</u> <u>Zimmerman</u>, 277 F.3d at 433 (explaining that "[t]here was no necessity for [the officer's] statement [(linking those with a sexual interest in children to the collection of child pornography)] had the police *not* been searching for child pornography") (emphasis in original).  Finally, it is unclear what evidence—other than the pictures the Victims' mother already had on her phone—Trooper Price hoped to collect to corroborate the fact that the Victims were in fact inside Defendant's home.

animals or other prohibited sexual acts defined by Title 18 Sections 3101 and 6312." Id. (internal citations omitted).

The Third Circuit held that "there was no probable cause to search Zimmerman's home for child pornography" and that the good faith exception did not apply. Id. at 432, 437-38. It explained that the officers "[c]learly . . . intended to enter Zimmerman's home to retrieve *child* pornography, although there was absolutely no information in the affidavit or anywhere else indicating that child pornography was—or ever had been—located there." Id. at 433 (emphasis in original). The Court noted that although the officer "described in great detail the sexual misdeeds that Zimmerman allegedly committed . . . [those acts] had nothing to do with whether there was pornography in his home." Id. at 437. Accordingly, "[a]ny 'reasonably well-trained officer' would have known that there was . . . no evidence whatsoever to support a search for child pornography." Id.

The Third Circuit examined a similarly deficient warrant in Virgin Islands v. John, 654 F.3d 412 (3d Cir. 2011). There, police began investigating John—a schoolteacher—after several of his sixth-grade students told officers that he had inappropriately touched them. Id. at 414. Officers interviewed the students, who explained that "John . . . sexually assault[ed] them in his classroom." Id. They also advised officers that "John maintained two spiral notebooks, one blue and one red, in which he routinely ma[de] notations . . . regarding his students," including "inappropriate things about the female students of his current class and previous classes." Id. (internal quotations and citations omitted). John "carried the notebooks with him to and from school each day." Id. Officers applied for a search warrant for John's home, referencing the above information and including an opinion that "persons who commit sexual offense crimes involving children customarily hide evidence of such offenses, including notes, photographs, [and] computer files, in their homes and on their computer[s]." Id.

The Third Circuit affirmed the district court's decision to suppress evidence from that search, agreeing that the probable cause affidavit did not contain "a single assertion that John was in any way associated with child pornography." Id. at 418-19 (internal quotations and citations omitted). The Court took issue with the officer's opinion regarding an "assault-pornography" correlation, holding that if an officer includes such an opinion in a probable cause affidavit, she is required to "state explicitly her belief in the existence of a correlation . . . as well as reasons justifying such a belief." Id. at 419-20. Because the officer neither explicitly stated her belief nor provided any basis for the belief, she was not "permitted either to draw an inference from facts not stated in the affidavit or to rely on her own personal knowledge." Id. Because that is precisely what she did, the Court found that the officer's "reliance on the warrant was entirely unreasonable" and that the good faith exception did not apply. Id. at 421 (internal quotations and citations omitted).

In Caesar, the Pennsylvania State Police received a tip about "suspicious online activity by an eBay user." 2 F.4th at 164. Officers investigated the tip and found "several outgoing messages from [an account] seeking to buy children's used underwear and swimsuits." Id. The defendant "asked for a photo of the inside of the clothing . . . and for information about the age and weight of the child who previously wore it." Id. In another message, the defendant—who "posed as a child looking for photos or videos of other children in their undergarments"—asked: "Can your son David do another video in these or the white ones before you send them? Or some pics please? I didn't win the black and blue ones my brother wanted. Someone out bid [sic] me . . . after the sale was over. Can you ask your son if he would like to exchange email addresses please?" Id.

Police confirmed that the defendant sent these messages from his home in Pennsylvania. See id. Police also learned that the defendant had sexually abused two adolescent brothers: the

defendant had supplied the minors with alcohol, "forced [one] boy to masturbate him," and sexually abused the other.  Id. at 164-65.  All of the abuse occurred at the defendant's home.

Police included the above information—including the eBay messages and sexual abuse allegations—in their affidavit of probable cause.  Id. at 165.  The affidavit also included an opinion from one Pennsylvania State Trooper, explaining that he "kn[ew] that those involved in the sexual abuse of children and juveniles routinely keep and maintain . . . [digital or physical copies of] photographs of nude children and of children posed in various states of undress . . . [and] videos of nude children and of children posed in various states of undress performing sexual acts . . . ." Id. at 165-66 (alterations in original).

After a magistrate judge issued two warrants to search the defendant's home, the district court suppressed the evidence collected from the search.  In reversing the district court, the Third Circuit only relied upon the good faith exception.  Id. at 168-69 ("Because we conclude that the good faith exception applies, we need not determine whether probable cause supported the searches in the first place.").

The Caesar Court distinguished Zimmerman and John, citing two key reasons why the good faith exception applied: (1) the victims' allegations of sexual abuse occurred in the defendant's home; and (2) the defendant demonstrated an "interest in images of partially dressed minors and [took] steps . . . to secure such images," including the use of *online messages* which showed Caesar's sexual interest in children.  Id. at 175.  The Caesar Court stated that the second fact—the online nature of the defendant's acts—was "arguably more important[]" than the first. Id.

Several important facts present in <u>Caesar</u> are absent in the case before me.  First, the <u>Caesar</u> defendant was a "single man with no children, bid[ding] on used children's underwear and swimwear . . . [and] request[ing] videos or photos of children modeling the posted clothing items." <u>Id.</u>  Second, some of the messages were graphic and clearly indicative of the defendant's sexual interest in children.  <u>See id.</u> at 176.  Despite the non-pornographic nature of the eBay activity, the <u>Caesar</u> Court stated that "the child-focused sexual nature of the messages was obvious based on the . . . information in the affidavit."  <u>Id.</u> at 175-76.  The Third Circuit emphasized that, "Caesar's eBay activity, taken together with the detailed allegations of ongoing and contemporaneous sexual abuse in his house, could indicate his interest in pursuing visual sexual stimulation *online*."  <u>Id.</u> at 176 (emphasis added).  The Court explained, "[i]t was not entirely unreasonable to believe that Caesar, an individual who had sought to obtain photos of partially dressed children, would likely possess such photos—or perhaps more explicit photos—in the place where he pursued his physical sexual interests with the two brothers."  <u>Id.</u>

### B.  Probable Cause Analysis

#### i.     *The First Search Warrant*

The first question before me is whether Police had probable cause to search for child pornography—a distinct and separate crime from the state offenses enumerated in the first search warrant.  Unlike the <u>Zimmerman</u> defendant, there is no indication that Defendant showed the Victims pornographic images in his home on some digital or non-digital medium.  <u>Cf.</u> 277 F. 3d at 430.  And unlike <u>Caesar</u>, there is no indication that Defendant used the internet or other electronic devices to search for children in various stages of undress or to swap messages with others on the internet in a manner implicating his sexual interest in children.  <u>Cf.</u> 2 F.4th at 174-75.

Instead, the affidavit before me reflects separate and siloed facts: (1) that Defendant exposed himself to children; and (2) that Defendant took non-pornographic pictures of the minors and sent some images to their parents. The key, for purposes of this Motion, is that fact number two—Defendant's use of an electronic device—is unconnected to Defendant's sexual interest in children. Indeed, the facts here are significantly different from those in <u>Caesar</u>, where the defendant used his home computer to explore his sexual interest in children.

To be clear, the defendant in <u>Caesar</u> not *only* searched for "images of partially dressed children" on his computer, but he also posed as a child or a parent on his computer and sent messages, "the child-focused sexual nature [of which] was obvious based on the other information in the affidavit." 2 F.4th at 175-76; <u>see, e.g.</u>, <u>id.</u> at 176 ("In one of its most graphic portions, the affidavit stated that after receiving a message from Caesar soliciting children's undergarments, another eBay user replied, '[i]f you buy it I will lube it and cum into [it] for you in skype real show and you can watch this.'"). In contrast, in the case before me, the only reference to visual depictions of children are the non-pornographic photographs sent to the minors' mother and Defendant's non-criminal use of a Go-Pro. These depictions were not sexual in nature or connected in any way to Defendant's sexual interest in his victims. This is a stark difference from the <u>Caesar</u> defendant's detailed plan to obtain, via the internet, depictions of children for his own sexual gratification.

The Government attempts to bolster its probable cause argument, pointing to the opinions of Trooper Price, who stated that persons with a sexual interest in children may possess or retain depictions of children on their electronic devices for purposes of sexual gratification. But, and as explained <u>infra</u>, Trooper Price's opinions cannot, on their own, establish probable cause to search for child pornography.

Under these circumstances, a reading of the four corners of the first affidavit precludes me from finding there was a "fair probability" police would locate child pornography on Defendant's computer and other electronic devices.  For these reasons, I find that the first warrant lacked probable cause.

### ii.    *The Second Search Warrant*

The second warrant is nearly identical to the first, save for a few differences.  First, Trooper Price included a new conclusion: her belief "that there may be photographs and/or videos . . . [of] other minors whose identities are not yet known to police as well as sexually explicit images of children."  (ECF No. 26 Ex. B at 8 of 8.)  This warrant sought the right to "[f]orensically download all device contents and seize all information . . . that pertains to Victim 1 and Victim 2 and the crimes of Sexual Abuse of Children."  (Id. at 3 of 8.)[6]

Second, Trooper Price described the circumstances surrounding the execution of the October 20, 2023 search warrant, where Defendant was found masturbating.  Trooper Price did not, however, find Defendant viewing child pornography or looking at non-pornographic images of children.

Regarding the second warrant, the Government presses that the circumstances of Defendant's arrest establish an intent to conceal child pornography.  The Government explains that Defendant did not hide his erection, the lotion, or the unknown fluid, but took steps to conceal whatever was on the ejected hard drive.  (N.T. May 19, 2025 at 16:12-17:11.)  The Government urges that "it[ is] not a leap to say that he's trying to hide what he knows is illegal when he knows the police are at his front door."  (Id. at 39:6-8.)  But again, these facts are devoid of any reference

---

[6] I note that Defendant had not been charged with Child Sexual Abuse at that time.

or connection to child pornography.  Instead, and at most, the affidavit provides enough information for a magistrate to find probable cause that Defendant was masturbating near his computer—a non-criminal act.

The new information contained in the second search warrant does not move the probable cause needle.  Because the use of a digital device is not tied in any way to Defendant's sexual interest in children, there remains no probable cause to search the devices.  Under these circumstances, the second search warrant is also deficient.

### C.  The Good Faith Exception as Applied to the First and Second Warrants

The exclusionary rule is only applied in "'unusual cases' where it may achieve its 'remedial objectives': to appreciably deter unreasonable searches and seizures by law enforcement officers." Caesar, 2 F.4th at 169 (quoting Leon, 468 U.S. at 918).

> There are four situations where the good faith exception does not apply:
>
> 1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> 2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;
>
> 3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or
>
> 4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

United States v. Tracey, 597 F.3d 140, 151 (3d Cir. 2010) (citing Zimmerman, 277 F.3d at 436-37). Defendant primarily argues that the third situation applies because Trooper Price's belief in the existence of probable cause was entirely unreasonable.  (ECF No. 24-1 at 21, 25.)

The question is thus whether "an officer could reasonably believe that probable cause existed by assessing the facts in light of the relevant legal standards and pronouncements in applicable precedent."  Caesar, 2 F.4th at 171.  The Government contends that the good faith exception applies, arguing that Caesar is both binding and on point.  (N.T. Mar. 19, 2025 at 28:5-12.)

The Caesar Opinion emphasized that the exclusionary rule applies in "rare circumstances," only where official conduct is "sufficiently deliberate," "reckless" or "grossly negligent."  2 F.4th at 169-170 (internal quotations and citations omitted).  The Caesar Court also noted with approval the affiant's reliance on a "judicial determination" that probable cause existed and explained that the Court could not "ignore the volume of social science research and legal authority discussing the tendency of child sexual abusers to possess child pornography."  Id. at 176.

Despite this guidance, I find that Caesar is distinguishable.  This is so, primarily because in the case before me, there is no connection between Defendant's sexual interest in children and his use of digital devices.  A further comparison of the facts in Caesar and the case before me illustrates this point.

Like Caesar, this case involves sexual acts which occurred in the home as well as non-pornographic photographs of children.  But, unlike Caesar, the first and second search warrant applications contain no facts connecting Defendant's use of digital devices to his sexual interest in children.  Here, Defendant was the father of a young boy and Victims 1 and 2 would frequent Defendant's home to play with his son.  While at his home, Defendant sent non-pornographic photographs of the Victims to their mother.  The leap between those facts, and the belief that Defendant is producing or retaining child pornography on digital devices at his home, is simply too large to be "reasonable."

The Government attempts to bridge this gap and create reasonableness by pointing to Trooper Price's experience, training, and opinion that "persons with a sexual interest in children may use electronic devices to store images and/or videos of children for the purpose of sexual gratification." (See ECF No. 26 Ex. A at 4-5 of 15.)

The John and Caesar cases both discuss the concept of a "molestation-pornography" correlation. The John Court explained that "officers who rely on this correlation must offer a factual basis for the magistrate judge to evaluate independently." Caesar, 2 F.4th at 177 (citing John, 654 F.3d at 419-20). The Caesar Court explained that its determination did not disturb this "key principle" and "that probable cause to believe a defendant engaged in child molestation, alone, cannot establish probable cause to search for evidence of the separate crime of possessing child pornography." 2 F.4th at 178 n.12. Still, the Caesar Court, citing the officer's "lengthy experience conducting criminal investigations and . . . extensive list of investigative training courses," held that, "at the very least," the officer "tried to comply with John's requirements, further supporting [a] conclusion that he searched for the images in good faith." Id. at 177-78. The Third Circuit explained that despite the officer's lack of "experience investigating sex offenses . . . the summary of his background analyzing criminal behavior in other contexts and his generally applicable training satisfied John's basic requirements." Id. at 177 n.11. Those averments, "[c]oupled with [the Caesar officer's] obvious familiarity and personal connection with the facts of [the] case . . . were adequately tailored to support a good faith determination." Id.

Here, other than listing a series of crimes she has investigated, Trooper Price did not explain what training or experience she had which would allow her or a magistrate to, in good faith, believe that Defendant's sexual interest in children could mean that he also retained child pornography on his electronic devices. Thus, it cannot be said that Trooper Price "at the very least tried to comply

with <u>John</u>'s requirements." <u>Caesar</u>, 2 F.4th at 178; <u>cf.</u> <u>United States v. Zema</u>, No. 20-228, 2023 WL 2855058, at *7 (W.D. Pa. Apr. 10, 2023), <u>aff'd</u> No. 23-3126, 2024 WL 5251666, at *1 (3d Cir. Dec. 31, 2024) (finding the good faith exception applicable where FBI Special Agent "did more than provide the magistrate judge with a boilerplate recitation of the [molestation-pornography] correlation.").[7]

The Government also asserts that Trooper Price "demonstrated good faith by presenting each search warrant for review and approval to Chester County's [Deputy] District Attorney before presenting them to the Magistrate Judge." (ECF No. 26 at 30.) But the Deputy DA's "approval" of Trooper Price's probable cause affidavit only appears via a signature in the application for search warrant authorization and it is entirely unclear the extent to which the Deputy DA reviewed the affidavit. (<u>See</u> ECF Nos. 26 Ex. A at 2 of 15; 26 Ex. B at 2 of 8.)

Courts in this Circuit have found that approval by a prosecutor could be a factor in determining good faith. <u>See</u> <u>Tracey</u>, 597 F.3d at 153; <u>United States v. Couvertier</u>, No. 15-173, 2017 WL 1062423, at *7 (M.D. Pa. Mar. 21, 2017). Here, however, because Trooper Price provided only conclusory and unsupported opinions regarding the likelihood that Defendant kept child pornography, the Deputy DA's signature and magistrate's approval does not support a good faith finding. <u>See</u> <u>Caesar</u>, 2 F.4th at 177 ("[O]fficers who rely on [the molestation-pornography] correlation must offer a factual basis for the magistrate judge to evaluate independently.")

Finally, I must conduct a balancing test, "weighing the 'deterrence benefits of exclusion' against its 'substantial social costs.'" <u>Caesar</u>, 2 F.4th at 169 (quoting <u>Davis v. United States</u>, 564

---

[7] I have independently compared the probable cause affidavit in <u>Caesar</u> to Trooper Price's affidavits here. <u>See</u> <u>United States v. Caesar</u>, No. 18-525 (E.D. Pa. Oct. 11, 2019) (ECF No. 40 Ex. A at 3-4 of 6). Whereas the <u>Caesar</u> officer listed specific trainings and experience to support his opinions about the molestation-pornography nexus, Trooper Price did not.

U.S. 229, 237-38 (2011)).  I recognize, especially in a case like this where child victims are involved, that the societal costs of suppression are high.  This Court will be deprived of reliable evidence showing that Defendant not only kept child pornography, but that he secretly filmed the shocking sexual abuse of his victims.  I have also considered that, although Defendant may still face state charges, more serious penalties associated with federal child pornography offenses will not apply.  As such, exclusion here is truly a "bitter pill."  Davis, 564 U.S. at 237.

Nevertheless, that pill must be swallowed where the "substantial deterrent effect" outweighs the above costs.  Leon, 468 U.S. at 907 n.6.  As was the case in John, the deterrent effect here is both clear and substantial: "[r]eliance on a warrant affidavit that omits a fact critical to any reasonable belief in the existence of probable cause is the sort of thing we can expect the exclusionary rule to deter."   654 F.3d at 420; see also id. at 420 ("[D]eterring police from submitting (and magistrates from accepting) affidavits that completely omit crucial factual allegations is a preeminently worthy goal.")

To be clear, I do not find that Trooper Price purposely "omitted" a "crucial fact."  But a critical and absent fact remains—there is simply no connection between Defendant's sexual interest in children and the evidence that was searched for and seized from his electronic devices.  Because the good faith exception does not protect Trooper Price's actions, I am compelled to suppress the evidence obtained as a result of the first and second search warrants.

### D.  Third and Fourth Warrants

The third and fourth search warrants each resulted in the discovery of additional child pornography.  The question is whether such evidence is tainted by the illegal searches and seizures discussed above.

"[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and, relevant here, evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." Utah v. Strieff, 579 U.S. 232, 237 (2016) (internal quotations and citations omitted). There are, however, exceptions to those rules. The Government urges that one of those exceptions—the attenuation doctrine—applies and that the fruits of the third and fourth search warrants should be spared exclusion. (See ECF No. 26 at 37.) The Government also argues that an "independent good faith analysis of these subsequent warrants demonstrates that they fit squarely within the good faith exception." (Id. at 40.) Finally, the Government argues that because Defendant's wife turned over the subject evidence of the federal warrant, a warrant was unnecessary. (ECF No. 43 at 1.) I address each argument in turn.

### i.     Attenuation as Applied to the Subsequent Warrants

Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Strieff, 579 U.S. at 238 (quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)). The doctrine recognizes "'that where the causal link between the constitutional violation and later-revealed evidence is tenuous or, indeed non-existent' then the evidence may be admissible." United States v. Nash, No. 02-54, 2002 WL 31500920, at *8 (D. Del. Nov. 6, 2022) (quoting United States v. Pelullo, 173 F.3d 131, 136 (1999)). I consider three factors in determining whether the attenuation doctrine applies: (1) "First, [I] look to the 'temporal proximity' between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional

search"; (2) "Second, [I] consider 'the presence of intervening circumstances'"; and (3) Third, of particular significance, I "examine 'the purpose and flagrancy of the official misconduct.'" Strieff, 579 U.S. at 239 (quoting Brown v. Illinois, 422 U.S. 590, 603-04 (1975)).

The third search warrant was procured some two months after the second search warrant was executed, and the federal warrant some ten months thereafter. These gaps could weigh against suppression. See United States v. Pena, No. 19-3611, 2021 WL 5280247, at *14 (D. N.M. Nov. 12, 2021) (citing Kaupp v. Texas, 538 U.S. 626, 633 (2003)). Temporal proximity is but one factor, however.

I next look to "the presence of intervening circumstances." Brown, 422 U.S. at 603. After stripping away the fruits of the illegal search—evidence gleaned from a review of the pictures and videos collected in the first and second search warrants—all that remains in the subsequent probable cause affidavits are the statements of the Victims and the Trooper and Agent's various opinions. The Government urges that the addition of new, independently gathered statements from Victims 3 and 4, establishes independent probable cause, thus introducing an intervening circumstance that establishes attenuation. (See ECF No. 26 at 39.)[8]  I disagree.

It is true that Victims 3 and 4 provided statements before the content of Defendant's digital devices was known. But their statements to Pennsylvania State Police do not provide an independent basis for probable cause to search the electronic devices at issue. On October 23 and 27, 2023, Victims 3 and 4 both made statements in line with Victims 1 and 2, that Defendant exposed his genitals to them while they played at his home. Victim 4's statements go a step further;

---

[8] To the extent the Government contends, as it relates to the federal warrant, that Defendant's wife's voluntary production of several SD cards containing child pornography represents an additional intervening circumstance, I disagree for reasons set forth below.

he explained that Defendant "touched [his] entire naked body . . . , including his genitals, and had Victim 4 check the defendant's body and touch his genitals." (ECF No. 26 Ex. C at 3 of 8.) But neither victim connected their abuse to the use of digital devices or inappropriate photographs. Accordingly, it is unclear how the intervening act—the inclusion of the new Victims' statements—could have broken the causal chain and constituted a separate reason for issuing the subsequent warrants. Because the third and fourth search warrant applications thus necessarily rely upon the evidence obtained from the initial illegal searches to obtain further evidence of child pornography, this factor weighs against attenuation. Cf. Strieff, 579 U.S. at 240 (finding, as an intervening circumstance, a valid arrest warrant which was "entirely unconnected with the [unlawful] stop" and "predated [the officer's] investigation.").

The third factor also weighs against attenuation. This is not a case where some recordkeeping error led to an unlawful search. Cf. Herring, 55 U.S. at 144. Nor is it a case where the offending officer "made two good-faith mistakes" and "was at most negligent." Cf. Strieff, 579 U.S. at 241. Instead, and as previously explained, the first two search warrants were so lacking in probable cause that they were, at a minimum, grossly negligent. Again, this is exactly the type of police conduct that the John Court held warranted exclusion. 654 F.3d at 420-21.

Accordingly, and for the reasons discussed above, these new statements fail adequately to attenuate the third and fourth search warrants from the taint of the illegal searches.[9]

---

[9] The Government urges that the identification of Victims 5, 6 and 7—minors discovered after reviewing the devices collected from the first three search warrants—and any future testimony should not be suppressed. (ECF No. 26 at 39.) My holding regarding the subsequent warrants need not reach that question and I make no ruling on the issue at this time.

ii.    *Good Faith as Applied to the Subsequent Warrants*

The Government next urges that I need not suppress evidence derived from the latter two warrants because the good faith exception applies.  (ECF No. 26 at 40.)  There is currently a split among circuits with respect to this issue.  Several circuit courts have held that "the good faith exception may, under certain circumstances, overcome the taint of earlier unconstitutional conduct."  Caesar, 2 F.4th at 179 n.14 (citing United States v. Massi, 761 F.3d 512, 525-28 (5th Cir. 2014); United States v. McClain, 444 F.3d 556, 564-66 (6th Cir. 2005); United States v. Fletcher, 91 F.3d 48, 51–52 (8th Cir. 1996); United States v. Thomas, 757 F.2d 1359, 1368 (2d Cir. 1985)).  Others have held that the good faith exception cannot cure the deficiencies attached to a warrant supported by tainted evidence.  See United States v. McGough, 412 F.3d 1232, 1239–40 (11th Cir. 2005); United States v. Vasey, 834 F.2d 782, 789–90 (9th Cir. 1987)).  The Third Circuit has not "squarely addressed" this issue.  Caesar, 2 F.4th at 179 n.14.

Even if the Third Circuit adopted the reasoning of Massi or McClain, I would still suppress the fruits of the third and fourth warrants.  Under Massi, the following "requirements must be met for evidence to be admissible: (1) the prior law enforcement conduct that uncovered evidence used in the affidavit for the warrant must be 'close enough to the line of validity' that an objectively reasonable officer preparing the affidavit or executing the warrant would believe that the information supporting the warrant was not tainted by unconstitutional conduct, and (2) the resulting search warrant must have been sought and executed by a law enforcement officer in good faith as prescribed by Leon."  761 F.3d at 528.

I find that the third warrant application, submitted by Trooper Price, cannot be saved by the good faith exception for the same reasons which made the first two warrants deficient.  As for the federal warrant, the Government appears to argue that because Agent Huff has an extensive

background in investigating child pornography collectors and because he "obtained the approval of an experienced prosecutor . . . who supervises all child exploitation cases and reviews and approves all related search warrants in this District," I should apply <u>Massi</u>'s holding and find that the good faith exception applies despite the warrant's reliance on the taint of the three state warrants.  (ECF No. 43.)

But again, I find that because the first two warrants were not close enough to the line of validity, the federal warrant's reliance on the fruits of the prior searches was not objectively reasonable.  Those warrants so lacked any indicia of probable cause to search for child pornography on Defendant's electronic devices, that any reliance thereon—even at a later date by Special Agent Huff—would be unreasonable.

Accordingly, even if the Third Circuit adopted a rule that allowed the good faith exception to overcome the taint of unlawfully procured evidence, such a rule would not weigh against suppression here.

### iii.     *Private Search*

Finally, the Government argues, almost in passing, that Special Agent Huff "did not need any warrant at all to search the[] consensually produced devices."  (ECF No. 43.)  To the extent the Government now urges that Defendant's wife's forfeiture of the devices in question allowed agents to conduct a warrantless search of the hard drives, I disagree.

Although Defendant's wife voluntarily produced several hard drives located in the home she shared with Defendant, this "private search" did not allow investigators to expand the scope of the wife's limited consent to the contents of those devices.  <u>See</u> <u>United States v. Crist</u>, 627 F. Supp. 2d 575, 582 (M.D. Pa. 2008) (citing <u>Walter v. United States</u>, 447 U.S. 649 (1980))

(explaining that "an individual can retain a legitimate expectation of privacy after a private individual conducts a search").  The scope of the private search or seizure here was incredibly narrow: Defendant's wife turned over several SD cards without inspecting their contents. Moreover, the federal warrant states that Defendant's wife "had never seen the[] items before and that they were located in an area where [Defendant] kept his possessions."  (ECF No. 27 at 21.) In these circumstances, the private seizure of Defendant's electronic devices did not give the Government *carte blanche* to rummage through the contents therein.  See Crist, 627 F. Supp. at 586 ("Where, as here, substantial privacy rights remained after the private search and the government actors had reason to know that [a further search] would likely reveal more information than they had learned from [the private individual's] brief search, the Court finds that the scope of the private search was exceeded.").

Accordingly, a valid search warrant was required to search the content of those devices.

## IV.    CONCLUSION

For the aforementioned reasons, I find the initial search warrants (warrants 1 and 2) deficient in a manner demanding the exclusion of the items seized.  Because the subsequent search warrants (warrants 3 and 4) rely exclusively on the fruits derived from the original warrants to obtain further evidence of child pornography, I find their exclusion is necessary as well.  Because there is no connection to Defendant's electronic devices and his sexual interest in children, an officer could not reasonably believe that probable cause existed to search such devices for child pornography.

I raise one last observation. My ruling reflects my best effort to faithfully construe and follow the holdings of John, Zimmerman, and Caesar.  I note that other circuits—albeit in different

contexts—have found that the nexus between a sexual interest in children and the retention of child pornography reflects "common sense" or is "intuitive." <u>Caesar</u>, 2 F.4th at 177 (internal quotations and citations omitted); <u>see also</u> <u>id.</u> at 177 n.10 (collecting cases from the 2nd, 5th, 8th, and 11th Circuits). The Third Circuit has not however, decided to "go that far," stating that the molestation-pornography correlation is a factual question, and that officers must—at the very least—explain what background or training allows them to make such a connection. <u>Id.</u> at 177-78. Because Trooper Price's affidavits lacked both the requisite facts and a sufficient explanation of Trooper Price's background, experience, and training, I am compelled to grant Defendant's Motion.[10]

     An appropriate Order follows.

---

[10] On June 23, 2025, I ordered the Parties to provide supplemental briefing on whether FBI Agent Huff's lengthy probable cause affidavit "complied with <u>Caesar</u> and <u>John</u>," thus allowing a finding of good faith for any molestation-pornography nexus made relating to the federal search warrant. (ECF No. 41.) In response, the Government acknowledged that "Agent Huff did not state or rely on any such inference in his affidavit." (ECF No. 43 at 3 of 4.) Therefore, I do not discuss whether Agent Huff's extensive background and training would allow him to, in good faith, connect Defendant's sexual interest in children to the child pornography sought.